The next case will be 081141 Wieland-Werke AG v. Eagle Brass Company and the United States. Mr. Schroer. Good morning. May it please the Court. My name is Michael Schroer from Arnold and Porter and I'm appearing today on behalf of the German respondents in their challenge to the March 2006 ITC Sunset Review. First, I will address the Commission's accumulated injury determination, specifically its conclusion that relative prices in the U.S. and other markets created, quote, some incentive, end quote, for producers in the four subject countries, quote, to produce and export more of their product to the United States in order to use more fully their available capacity. Second, I'll address the Commission's likely adverse impact finding for Germany alone. With respect to the price incentive analysis, our point is a simple one. Neither the analysis used nor the evidence relied upon are capable of supporting the Commission's conclusion that there was any price incentive for German and other subject producers to export to the U.S. In terms of the applicable standard of review, there is no substantial evidence supporting the conclusion because there is no rational connection between the facts found and the conclusion drawn. There are three fundamental problems. First, the starting point for any price incentive analysis must be the U.S. price the Commission expects the subject producers to receive. That's not what the Commission used. The Commission concluded that subject producers would increase their exports to the U.S. by selling at, quote, significantly, end quote, lower prices than U.S. producers were charging. That's at the joint appendix at page 2640. But it performed its incentive analysis using the higher U.S. producer prices. It's as if the Commission found that there was an incentive to produce at a dollar a pound and concluded that therefore the subject producers would sell at 80 cents. The analysis cannot support the conclusion. Put another way, there is an internal inconsistency between the Commission's volume analysis at page 2639 of the appendix and its price effects analysis at page 2640. There is no evidence that the lower price levels that the Commission found would be necessary for German and other subject producers to increase their exports to the United States were feasible. There's no evidence that they would be profitable. There's no evidence that they could recover their variable costs. There's no evidence that those price levels were higher than prices they achieved anywhere else in the world. So no evidence means lack of substantial evidence. You haven't mentioned that standard of review. You've been arguing as if we're trying this case of an issue, but the Commission is entitled to substantial evidence. But your point is there's no evidence. Our point is twofold, Judge Lori, and I apologize. I thought I did mention the substantial evidence of review. We are, except for two exceptions, we are not really arguing that there is no evidence supporting the Commission's findings. Rather, we're saying take the factual finding they made. There's no rational connection between that factual finding and the conclusion they drew from it. That's a substantial evidence-based standard, the absence of a rational connection between the facts found and the conclusions drawn. So we're not so much saying that there's no evidence to support the conclusion. In this case, we're saying the analysis they made can support the conclusion. Second problem with the Commission's analysis is that they compared absolute prevailing prices in different markets, not the returns to the producers' net of duties and freight. One cannot conclude that a producer in Germany has an incentive to export to the U.S. due to U.S. price levels unless one first subtracts the U.S. import duty and the freight cost. The Commission had the data to do so and did not. The third problem is that in looking at prices in Brazil and China specifically, the Commission did not use prices received by the subject producers. I've been waiting for two years now for someone to explain to me the basis for the Commission's reasoning that went as follows. Because Brazilian producers sell brass in the closed Brazilian market at a lower price than U.S. producers sell in the U.S. market, that somehow creates an incentive for a producer in Germany or France to export more to the U.S. That was the Commission's logic. They haven't explained it in a brief. The CIP ignored the issue entirely and it makes no sense. Unless a German producer is selling to Brazil at those prices, one cannot draw any incentive conclusion. The exact same problem exists with the Commission's analysis of pricing data for China. The Commission relied upon the dump prices one U.S. producer charged in China and ignored entirely all of the evidence of the prices that the German and other subject producers were receiving, which were much higher. As to Europe and Germany, the domestic industry and the German industry witnesses both agreed that prices were higher in Europe than in the United States. There is no evidentiary support, no evidence, Judge Lurie, for the Commission's finding on page 2639 that, quote, OAB reported that fabrication prices for brass sheet and strip in the United States are comparable. They didn't say that at all. All they said was they had been comparable in the years past but were no longer comparable because of exchange rate differences. European fabrication prices were higher. To the extent any price incentive existed, it was for German and other subject producers to produce and sell more brass in their backyard, in their local markets, and in Europe, not to the U.S. This Court therefore should hold the Commission's incentive finding to be unsupported by substantial evidence. I'll turn now to the likely discernible adverse impact finding for Germany. First point is that the inadequacy of the Commission's incentive analysis as part of its cumulated injury determination has implications for its likely adverse impact analysis for Germany. The CIP held, both in this case and in the Cognate case, that to satisfy the likely standard for the discernible adverse impact test, the Commission must show that German producers would have some incentive to sell a discernible amount of brass sheet and strip in the U.S. market. It's not enough that they have the physical ability to do so. There must be some incentive to do so. It's the difference between a likely standard and a possible standard. But the Commission made no incentive findings specific to Germany. Indeed, with higher prices available in Germany and Europe, applying the Commission's own incentive analysis, one can only conclude that there was no incentive to produce and sell more to the United States. But two aspects of the Commission's discernible adverse impact analysis. That establishes a possibility. It doesn't establish a likelihood. The CIP is quite explicit in this case and in other cases that the mere existence of capacity or the ability to shift capacity or shift from other markets isn't enough. You have to show that there is some incentive for the subject producers to do so. It's not enough to just have physical ability. Isn't there some statement or indication that they would export to the United States? The German producers, Wieland specifically and its affiliate in the United States, said that what they would like to do is to produce a higher quality product than was available in the U.S., a small quantity that they thought there was a niche they could sell it for in the U.S., at prices higher than prevailing U.S. prices. They gave a percentage. They said 10 to 15 percent higher. That statement cannot support a conclusion, which the Commission drew, that they would sell at prices underselling U.S. producer sizes. They said that they can't sell at current prices. They can't recover their variable costs in doing so. They could only sell at a price premium. That can't support a conclusion that they would sell at underselling prices. They were very explicit that underselling prices and current prices would not enable them to recover their costs. Wasn't there a high level of exports from Wieland before the order was imposed? There was a high level of exports that increased from the period 1983 to 1984 when the dollar was very strong. It immediately dropped in 1985 when the dollar began to drop. The dollar dropped by 50 percent over two years from 1985 to 1987. Wieland's exports to the United States dropped precipitously before this case was even filed. So there's no linkage between the drop off in exports and the order or the filing of the case. Our position is that those were independent events. Even the Commission, in its brief, says that one of the reasons imports dropped off before the order was filed was because U.S. demand started to decline. Well, if that's true, look at what was happening to U.S. demand during the period of the Commission's current investigation. U.S. demand was dropping again during this period. So take our view that the increase was due to exchange rates or their view that it was due to demand. In either case, it had nothing to do with the order. And looking at what exchange rates are doing currently and what demand is doing currently, that would suggest, if it's following the earlier trends, that imports would decline, not increase. The two aspects of the Commission's discernible adverse impact analysis that merit particular attention by the Court are, first, the Commission's export orientation finding, and second, its reliance upon 20-year-old factors. We talked about the 20-year-old factors, so I'll focus on the export orientation finding. This is not a factor mentioned anywhere in the statute, nor is it one that this Court has previously examined in depth insofar as we could determine. But the striking feature of the Commission's analysis here is that it is not tethered at all to the U.S. market. There's no basis for the Commission's premise that because German producers export primarily in their backyard to Europe, that they are likely to export to the United States. The Commission's analysis fails to differentiate among different export markets, which may have different supply and demand conditions. It's interesting that in the price incentive analysis, the Commission does look at individual markets and recognizes that different markets are subject to different conditions. But on its export orientation finding, it takes the position that exports are exports. As long as you're exporting to one country, even though it may be in your backyard to France, that makes it more likely you would export to the United States. I submit there's no evidence supporting that. In fact, given the exchange rate situation and conditions in the U.S., the U.S. was suffering from declining prices, declining demand, overcapacity, and import competition from non-subject imports. It was not an attractive market to German producers that had better opportunities in Germany, in Europe, and in Asia. Do you want to save your rebuttal? I would do so, Your Honor. All right. Thank you. Mr. St. Charles? Thank you. May it please the Court. Appellant's insistence that the unanimous Commission finding do not show likely increases in imports is astonishing not only because they admit that they intend to import in the event of revocation, but also because the Commission's analysis on volume was very thorough, considering both statutory and several other non-statutory factors that made the volume, in the case of no discernible adverse impact, sufficient to have a discernible adverse impact. Wasn't there admission that they might import if it's an admission at higher prices? Well, what they say is they have a product that they perceive as a high end of the spectrum of brass products, and that they say higher price, price premium, simply means that they're pricing it at what the market price of that higher quality product is. But isn't an exclusion order intended to prevent dumping, unfair competition? And so they're not underpricing. They're not undercutting. They're purporting to sell a premium product at a higher price. At a higher price than what? At a higher price than some other brass products, not the higher price than the domestic product that will be displacing. Moreover, the fact that there will be domestic product displaced is also injury. Volume impacts on the volume of the domestic producers is similarly injury, just as price effects are reflective of injury. Doesn't that get into the definition of subject merchandise? I'm sorry, Your Honor? In other words, would a better product at a higher price be within the scope of the order? Yeah, obviously they're admitting that their product would be within the scope of the order, and within any product that comes before the commission, there's generally a range of qualities and range of prices. The suggestion that they will be charging more doesn't mean they will not be underselling the domestic product that they intend to replace. Regarding continuation and recurrence of material injury for the accumulated imports, the statute requires the commission to consider two factors, the volume before the order was in place and whether there is an ability to create new merchandise to ship in the event of revocation, whether by excess capacity, current inventories, or product shifting, which was not an issue in this case. The commission addressed those two considerations and found that there was significant volume before the order was in place and that there was significant excess capacity, factors that the appellants do not deny. Moreover, in addition to those statutory factors, the commission found that there was a large share of current shipments from the four countries to export markets. Mr. Shore claims the export orientation of these producers is irrelevant. Well, of course it's relevant. They were exporting large volumes when they were exporting to the United States. They're no longer exporting to the United States, but they're still exporting a lot. So it's not as if they have ceased exporting altogether. They have simply ceased exporting to the United States. Mr. Shore also focuses on the commission's finding that the U.S. market is attractive. The commission based that on several factors, that there weren't significant impediments to entry into the United States, not the case for many other countries, that the data showed that there was instances in which the U.S. price was higher than other markets, instances in which there were the same instances in which they were lower. The fact that there's mixed data is a fairly nuanced and qualified finding, suggesting, as the commission reasoned, we found that the volume of imports was likely to increase somewhat in relation to the price alternatives in other markets. The notion that there were other prices than the China prices that the commission submitted is simply not true. As Mr. Shore said a moment ago, it ignored the prices that concern Chinese. The Chinese market's prices for the German product simply were not submitted by Mr. Shore. There are average unit value data on product mixes that are unidentified, but the only China-specific data we had was that which was submitted by the petitioners in this case, and that which we relied on. The consideration of Brazil that he objects to is that was the only other non-European price that we had besides China. We looked at that, and we considered all of the data together. It's not relevant whether this particular producer is shipping to Brazil. We don't know if the other three countries are, in fact, shipping to Brazil, if that's a factor that's relevant at all, and we submit it is not. The appellants claim that even though Germany was the largest source of imports in the original investigation, and even though the statute requires us to consider the volume prior to the orders going into effect, appellants claim that we shouldn't have considered this because they were leaving the market anyway. Well, as we explained, they declined during the period of investigation. They increased initially because demand increased. Then they declined in part because the investigation was underway. The commission made that finding, and the notion that they've dropped to nearly nothing simply because they were going to anyway is absurd in the face of the constant and regular effect of orders, which is very often the subject producers exit the market because they're unable to price fairly and compete. Now, on no discernible adverse impact, have I run over time? On no discernible adverse impact, this isn't the case in which the commission accumulated a tiny producer and they got caught up through accumulation, the German producers, in the accumulated analysis. Germany was the largest producer in the original investigation with a 10.6 share of the US market compared with France, 3.6, Italy, 1%, Japan, 2.8%. So the fact that we're even arguing this notion of no discernible adverse impact is a little hard to fathom. And it's particularly hard to fathom when we have the admission that they're going to displace US production by shipping in this what they call a high-quality product. Accordingly, we ask that you affirm our determination. All right. Mr. Cannon. May it please the court. The plaintiffs here have alleged really no legal or factual errors by the commission. They are asking the court simply to substitute its judgment for the commission in weighing the evidence. That's what this case is, pure and simple. And where Mr. Shore suggests that there is no evidence to support the commission on various issues, that is simply not correct. Let me start with the question of incentive. He continually says there's no motive, there's no reason, there's simply an ability, a pure ability for them to sell based on excess capacity. That's not true. Let me recite for you several of the record facts that show it's likely that they're going to sell here. And bear in mind that in looking at this particular requirement, the statute simply says is it likely they're going to sell here. It doesn't say is there an economic incentive, let alone is there a profit-maximizing economic incentive, as he would ask this court to read in. Why doesn't the statute do that? Precisely because you're dealing with dumping here. You're dealing with behavior where the import, the foreign producer, is generally selling at below cost, below home market prices. So you're dealing with a situation, by definition, where the foreign producer generally doesn't act in a profit-maximizing way. And indeed, on this record, there is evidence that Diehlend and the German producers were selling below cost during the period of review. It may be profit-maximizing in the long term, but not short term. That's correct, Your Honor, it may be. So that gives incentive to undercut, to penetrate a market. That's exactly what dumping is often all about. So being able to say, gee, my prices right now aren't high enough to make money, which is all, basically, they were trying to do at a discrete point in time, doesn't really tell you very much. But let me go back to the likelihood point. Number one, I would cite express statements by German producers that they will export to the U.S. market. In addition to, some of this is confidential, so I would just refer you to the joint appendix at 1536 to 1539, 1442, and 3001, where you'll find some of those statements. The second is express statements by U.S. purchasers that they will buy dumped imports from Germany and other countries if revocation occurs. They asked the purchasers, what will happen if this order is revoked? And the purchasers said, gee, we'd love to have some of those low-priced imports back in the country, and if they come in, we're going to look to offshore, and that's at JA1606-07 and 2551-2554. The Commission also looked at the affiliation between Bieland and the German producer. Here you have a related party in the U.S. that is a re-roller that needs to have as an input product the very product for which the dumping order is being asked to be removed. There's incentive right there. Wouldn't it prefer to source from its parent than from its competitor in the United States? Sure, of course it would, and that's what the Commission found. The export orientation of the industry. Mr. Schor says, it doesn't make any difference if we're export-oriented. We're not export-oriented to the United States. Yes, that's true right now because a dumping order is in place, but the very fact that Germany is an export-oriented country is hugely relevant. Look at the statistics that are before you in this record. You will see that Germany has increased its exports over the period of review, hitting some of its highest levels in the most recent time, right when the Commission was looking at this case. It was really getting increasingly export-oriented in 2004 and from 2005. That's when it was getting higher. And what about the United States? Well, sure, it wasn't selling there during the review period because there was the dumping order, and the dumping order at this time was 16%. It was a pretty hefty order. It was an exclusionary, Your Honor. It doesn't keep them out of the market, but it requires them to price discipline at that level, and they had gone to the Commerce Department. They had many opportunities to do that over the years. We're never able to show that they could sell fairly, so they lost. The next point I would say is the large and open nature of the U.S. market. He basically says, you know, it doesn't matter. The U.S. is just another market out there. The U.S. was not another market out here. Look at the data on the record at J2236 and 2635-39. You'll see how big the U.S. market is out there, and what the Commission also found is there's no structural impediment. It's very common knowledge. The U.S. is one of the most open markets in the world. You can sell here versus China or somewhere else. Guess what? Everybody and his brother wants to come here. That's what they did before the order was imposed, and that's what is likely to happen. Very common sense conclusion. A factor he wants you to ignore but that's very relevant in this industry is the need to utilize excess capacity to promote efficiencies. He says it doesn't matter that we have this capacity sitting idle. No reason, no incentive to sell it. But the members of the domestic industry testified on this record, and this is at J1817, 1826, 1929, and 1930, that when you are running a brass mill, there is every incentive in the world to maximize your utilization of your capacity to promote efficiencies and to reduce your fixed costs because you can spread them over a bigger volume. It's just a matter of good business sense. And if there was an opportunity to sell, sure, that's exactly what they would do. And I guess that brings me to my final point, which is it's not so much that we're talking about whether Dieland and the other German producers, or for that matter, the French and Italian and Japanese producers that are not mentioned very often here but that are also subject to this case and this decision. It's not so much whether they're going to ship product from one country to another. It's a matter of whether all that excess unused capacity that's sitting there idle that isn't being sold somewhere else right now is going to come into the United States when the order goes away. That's the only change here. And a sunset review is all about a status quo change. Something changes in the market. The only thing that's going to change from what's going on right at this point is the order goes away. So for him to say, gee, we'd rather sell in Germany, we'd rather sell in Europe or somewhere else because we could get better prices, if he could do that, they'd be doing that right now. And they are doing that. They're doing what they can. But even given the present situation that they faced, they had all this excess capacity still. So if the only change that happens is the order comes away and now you have a big attractive U.S. market, no impediments and no 16% duty, that's a very big incentive to sell here. So I would suggest to the court that if you're looking at all of the specifics as to why there is reason to sell, which is critically what underlies not only his arguments about these mixed prices and also his argument about discernible adverse impact, you'll find ample record evidence to support the commission's decision. And I will stop there unless you have any further questions. All right, thank you. Thank you. Mr. Schor. This case is about the specific challenges we raised to specific findings and conclusions the commission made. Ms. Cannon may be able to tell a convincing story and rewrite the commission's decision and point to evidence that would support different reasoning. That may be, but that's not the decision that the commission made. You can basically ignore almost every argument she made since it's nowhere found in the commission's decision. The notion that because you're dumping you're selling below cost or selling at prices in your home market, that's not in the commission's decision, and it's not even true. Because of commerce's practice of zeroing, it means that there were simply some sales in the U.S. market that were priced at lower than in the U.S. market. Indeed, Phelan's dumping margin in the original investigation was 3.81%. That almost assuredly means that without zeroing, the U.S. prices on average were much higher than the home market prices. She said that Phelan was never able to price fairly. Well, that's certainly not true. From the period 1992 to 1995, Phelan sold to the United States, underwent three consecutive reviews, and had zero margins throughout that period. She talks about the U.S. market being large and that being unattractive. Well, the largest market in the world is China. It's not the U.S. Wieland and German producers were selling very little to China, and it declined over the period of review. So the size of the market alone doesn't show that German producers are going to export there. That's not what happened. Let's look about capacity utilization. She likes to point to the fact that they have all this excess capacity. Well, let's look at the U.S. industry. The U.S. industry during this period was operating at 60% to 70% capacity. Why weren't they using all their excess capacity to export to China, the largest market in the world, or other markets? Because they couldn't get decent prices. So price matters. It's not just capacity. And the question that the Commission keeps avoiding answers is, why, if prices are higher in Germany and prices are higher in Europe, which they don't dispute and didn't dispute today and can't dispute in their brief, why would Wieland take all this excess capacity and export to the United States, where prices are lower? It doesn't make any sense. They haven't answered the basic question of why this capacity that isn't being used would suddenly be put to use to get lower prices than are available somewhere else. That's the heart of our case, and that's the question that they keep avoiding. The notion that Wieland said that they would export to the United States, so that's enough because that would displace some share of the U.S. market, that is not a finding the Commission made. The finding the Commission made in this case is that the discernible adverse impact would result from a higher volume at underselling prices and that the price effects were critical. You can't disengage the two. The Commission made no finding that additional volumes at prices higher than the prices prevailing in the U.S. for that product, and that's what we argued. We didn't say that they'd be higher prices than lower quality products. We would say we will sell the same product that our customers are currently buying in the U.S. from U.S. producers and give them a higher quality product of that price. Two customers, former customers of ours in the U.S. market, and it's cited in our brief, said that they would buy from us a product that they're buying from the U.S. industry and pay a higher price. The Commission nowhere found that the volume combined with higher price would cause injury to the U.S. industry. And finally, I'll address the Commission's statement that it made a finding that German imports declined after the order due to the order. That is a finding the Commission did not make in this case. It did not make in any case. It made a finding in an earlier review involving different countries on a cumulated basis. It never tied a finding that imports declined after the order to Germany, and that's the problem with their assertion that the fact that imports declined. Your time has expired. I apologize for going over. Thank you, Your Honor. Case is submitted. All rise.